from Dr. 2-16-0551, the people of the state of Illinois, Plaintiff's Affiliate, and the opinion of Magnuson, Defendant, Appellant. The first opinion on the affidavit of Plaintiff's Appellant is Gaffney F. Keating. The second opinion on the affidavit of Plaintiff's Affiliate is Mary Beth Burns. Thank you, Kazuki. You may proceed. Good morning, Your Honors. Counsel, may it please the Court. My name is Jasmine Eakin, and I represent the Appellant, David Magnuson. Mr. Magnuson was convicted of aggravated battery of a police officer and various offenses following a jury trial. He was acquitted of speeding, which was the basis for the traffic stop from which the aggravated battery charge arose. On appeal, we raised four issues. All challenged the aggravated battery conviction. And events surrounding that offense were captured in a video taken by Matthew Losey, a passenger in Mr. Magnuson's car. And the video was admitted into evidence by the state. For purposes of this argument, I intend to focus on our fourth issue, which concerns the trial court's procedure for allowing the jury to examine the video during its deliberations. And while we maintain that the evidence was insufficient to prove Mr. Magnuson's guilt beyond a reasonable doubt, at the very least, it was closely balanced, involving a credibility contest between the state's witnesses, Mr. Magnuson and Mr. Losey. As defense counsel argued to the jury during closing arguments, the video was, quote, the most vital piece of evidence that the defense had. He said it's accurate, it's unopinionated, it's worth a thousand words at least. Counsel told the jury they would be able to watch the video, quote, as many times as they needed to, because it was in evidence and that it was a very valuable piece of evidence. During deliberations, the jury sent a note to the court where written at the top, it said aggravated battery. And then the statement, we need to view the video again. But rather than sending the video exhibit back to the jury room where the jury could control its playback and view it as many times as necessary, as counsel had suggested they would be able to do, the court had them watch it one time in open court with the judge and the attorneys present. And you're not arguing that anything prejudicial happened during the viewing? I mean, nobody made any comments or anything like that, correct? No. Well, what was prejudicial during the viewing is the presence of others while they were in jury deliberations. While they were in jury deliberations. Chilled their deliberations. Right. But were they instructed not to deliberate during that time, not to say anything, just to watch it? No, they weren't instructed that. So there were no instructions. Some of the cases talk about giving certain instructions, and in this case there were no instructions. There were no instructions. There was no instructions not to communicate with each other. There was no instruction that. . . But there's no evidence that they did, right? There's not. But that's, you know, the cases that we discuss in our brief really center around the principle from United States v. Olano, and that is that it's a basic rule of our criminal justice system that jury deliberations are supposed to be private and secret. And the primary purpose of this rule is to protect jurors from improper influence. Now, even under Olano, that manifests itself in two ways. So one way is overt actual participation, either verbally or through body language. And the other way is where the presence of outsiders exerts a chilling effect. And we're saying here the presence of outsiders where the jury was required to view the video in open court exerted a chilling effect. Does the case law give rise to a presumption? I mean, are we to presume that it had a chilling effect? How do we draw that conclusion? Well, it had a chilling effect. I don't think. . . In this case, you could. . . You know, there are cases that have found where there's at least persuasive authority to say that it does have a chilling effect because it deprives the jury of the ability to watch the video contemporaneously and point out details to each other, freely examine it in the privacy of the jury room. Well, I concede the point, but I guess for purposes of our review, do we have to come to that conclusion? You don't have to. Automatic reversal if it's displayed in open court. No, Your Honor. You do not have to come to that conclusion. In this case, the way that this issue has been analyzed is clearly the court has the discretion to decide which exhibits go back to the jury room, and clearly the court has the discretion to determine what manner the jurors view the exhibits. But the question becomes, in determining whether the court abuses its discretion, is whether the defendant was actually or presumptively prejudiced. And our position is that in this case, the defendant was actually prejudiced. When the record was made, normally counsel will argue first of all. . . Did the defense counsel ask to have the video played? In the court. . . In this case. Did he ask to allow it to go back to the jury? Right. No. No. Who decided it was going to be played in open court? Was there any argument or colloquy at the bench? Because normally I think it would probably go back into the jury room. So how did it end up being played in open court? When the question came out from the jury, the court just said, we're going to play this in open court. Did the defense counsel want the video played? Well, based on his comments during the closing arguments, he definitely wanted it to be played. So you're complaining about the circumstances because as I look at it, the video in some ways impeached the officer's testimony and was helpful to the defendant. That's correct. And, yes, I believe what defense counsel signaled to the jury was this is the crux of our defense here. Look at this video and look at it as many times as you want to. Examine it. Look at the details. So that was my question because he kept saying that in the closing argument over and over. So my understanding when he kept saying that in the closing argument was at some point in a pretrial conference or a jury instruction conference when they were going through the exhibits, the court must have said or somebody must have given him the indication that this video is going back or is going to be admissible for the jurors to see. At what point, where did he get that information is what's going on. I think he assumed just like other demonstrative exhibits that it would go back. I think counsel assumed that it would go back because, for instance, if you have photographs of the crime scene, you go through that with the court. The court is going to go through all of the exhibits and say which exhibits are going to go back and which exhibits are not. Here there were only two exhibits, Your Honor. There was just the video exhibit and the flask, which really wasn't helpful to either side. Clearly here both sides relied on it. He was saying it's going back and you could look at it. The prosecution never objected. No. The court never said, ladies and gentlemen, I will decide what goes back or anything like that. No, and I think, again, because we're pretty much down to one piece of evidence, there wasn't like an exhibits conference beforehand to decide which should go back, which should not go back. I think the assumption was this is such an integral part of the case. We definitely want the jurors to be able to look at this and to be able to look at it, you know, slowly and carefully examine it and play it at their leisure. And I think the fact is, you know, the state brings up the fact that the jury was able to watch it during the course of trial three times before they asked to watch it again. But the point is that apparently those three times watching it in open court did not satisfy some questions that they had. I mean, so when the court responded to their question by just saying, okay, you can watch it again. Come back out into open court and I'll play it for you again. That is not a – you can't assume that that one showing was satisfactory because they had already seen it in that format. They were asking to be able to examine it more carefully. There must have been something specific on the video that they wanted to look at more carefully. But they didn't ask to see it again. They didn't. And again, I would say the reason – it's reasonable to assume that the reason they didn't ask to see it again is what defense counsel tells them, you're going to be able to watch this as much as they want. They ask the question, can we watch it again? And the procedure, the response is, yeah, you can watch it again. Come back out into court. I'll play it for you again. And after it was done playing, the court said, okay, all right, that's it. And so when the court tells them that's it, it's reasonable for them to assume that, oh, okay, I guess we don't get to. I don't want to assume anything. But how do you respond to the more recent or very recent Lewis case that basically says this procedure is not erroneous? I respond in several ways, frankly. First of all, the holding in Lewis is – you're right. The fourth district decided that there's a majority view that if a jury requests to see a video or hear it in open court, the judge always properly exercises discretion to have them view it in open court. But the court added this proviso, and it is that assuming the trial court has properly instructed the jury regarding this procedure by telling them, one, not to discuss the evidence in the courtroom, two, by admonishing everyone not to overtly comment on the evidence, and three, by instructing the jury that they can ask to see it again. We had not one of those instructions. But we had no comments. The first two are taken care of because nothing happened. Why do you need admonishment not to do something and the record shows it didn't happen and therefore it's prejudice? Well, if you look at People v. Henderson, Your Honor, in that case, you know, the error was that there were no representatives from the – the defendant wasn't there, defense counsel wasn't there, and the court just had a representative from the state's attorney's office play the video again in front – for the jury in open court. And the third district found that that was presumptively prejudicial because we don't know if, you know, the representative from the state's attorney's office was making faces or, you know – Right, but – but the record doesn't reflect – without an instruction not to make any comments or not to, you know, to make any type of, you know, reaction to it in any way. We don't know. We don't know that there were some – So you want us to infer error? We have to presume something went wrong, wouldn't we? No, I mean, I'm just saying that without an instruction not to communicate in any way about this while viewing the video, we cannot be sure that there wasn't some type of – again, some type of a lot of body language type of communication. We haven't spent all of your time on this. Speaking of missing instructions, you haven't yet argued. What about the fact the jury was not instructed that they were required to find – that the defendant was not justified in using the force that he used? That instruction wasn't that difficult, was it? That's correct, Your Honor. You find it to be problematic? I mean, that's another issue. Is that problematic? It's very problematic, yes. It's very problematic. I mean, that issue is another one to add on to the trial errors that occurred here. You know, they were given the definition of self-defense that a person is justified in the use of force when and to the extent that he reasonably believes such conduct is necessary to defend himself. But the defendant was not given the instruction that it was the state's burden to prove that the defendant was not justified in using the force he used. And shouldn't that have been given? Yes. That's reversible error in this case. In this case, it's reversible error. But your case law seems to go back and forth. I'm looking at this Huckstead case and Berry. So where do you line up on this? This is absolutely a Berry case. This is not even close to a Huckstead case. And the reason it's not even close to a Huckstead case is because in Huckstead, the court specifically pointed out, and this is how Berry distinguishes Huckstead, that during closing argument, defendant counsel repeatedly and specifically emphasized that the state had the burden of proving defendant was not justified in the force he used. In addition, the state explicitly acknowledges burden when in its rebuttal closing argument it stated defense counsel's contention that the state must show that the shooting was not justified is quite correct. So Huckstead found that these arguments and instructions as a whole apprise the jury that the state had the burden of proving that the defendant was not justified in the force he used. And it filled in the instructional gap of not including the proposition that it was the state's burden. In Huckstead, but not in Berry. Yes, and Berry is much more like our case. The jury was given general burden of instruction issues. The general burden of proof instruction issues instruction for the offense and also the definition of self-defense. But there was no counsel failed to inform the jury in closing argument of the defendant's burden of proving the unreasonable doubt that the defendant was not justified in the use of force. And the instructional gap was not filled by the prosecutor who Well, there was a hole in Berry. In this case, you're saying the instructional gap was not filled because the arguments of the attorneys did not fill it in this case. Nobody told the jury they had to find beyond a reasonable doubt that he was not justified in the use of force. Your Honor, in this case, the state didn't even acknowledge that there was a defense of self-defense in either closing or rebuttal race. So this comes in under plain error and Berry found plain error in this? Plain error on both prongs. Both prongs. How about the closing argument where you indicate that there was error when the state was trying to appeal to the safety of the jurors with respect to the police officer? That is the third error, Your Honor. Yes, I mean, that issue is improper prosecutorial misconduct, which, I mean, the state doesn't really dispute that the comments were erroneous and they, you know, this was a credibility case. Obviously, the jury was tasked with weighing the credibility of the police's version of events over Mr. Magnuson's version of events, and the state, right from the outset in their closing arguments, you know, went all in on bolstering the credibility of their police officers' witnesses based on their status as police officers. You know, they told the jury about what a difficult job it was to be a police officer, the dangers and risks involved. They united the interests of the jurors with, you know, their own safety with that of the interests of the state in convicting the defendant because they praised the officers as working to protect and serve each and every one of the jurors. You know, so basically the prosecutor appealed to the sympathy of the jurors for police officers in a case where clearly, you know, that could have tipped the balance unfairly against Mr. Magnuson. Thank you, Ms. Eakin. You will have time for rebuttal argument. Thank you. Ms. Burns, you may proceed. Thank you. Good morning, Your Honors. Good morning. May it please the Court, my name is Mary Beth Burns, and I represent the people of the state of Illinois. We come here this morning to ask this Court to affirm the defendant's conviction for aggravated battery of a police officer. With your permission, I'll go through the issues in the order that counsel discussed them, the first one being the manner of playing the video. As with all of the errors that were discussed, these are unpreserved errors, and the people believe that the defendant has shown nothing inherently problematic in the procedure and certainly nothing that would have prejudiced him. Isn't it, though, Ms. Burns, that when you have a jury trial, and there is a corporate case on this, jurors are basically going to look to the trial court for their guidance or for their lead. Absolutely. So if the trial court is saying, all right, come on in, I'll show you the video, and that's it, after they're done, aren't the jurors, can we assume that the jurors are going to be hesitant to ask again to look at that video as opposed to if it was given to them and to look at the jury room? No, I disagree. I don't think that anything that occurred here on the record would indicate that the jurors felt constrained not to seek it again if they felt that they needed it. Again, they were told that they could ask for it, and they did in fact ask for it, and they were given it. Nothing indicates that when they went back to the jury room and spoke among themselves, they felt that they needed to see it again. Nothing in this record would indicate that they felt constrained not to ask the court to see it again. Would it have been a better practice for the judge just to give them that video to take back in the jury room? I may be the wrong person to ask this because I asked one of the younger attorneys in our office how to operate the thumb drive. In one of the third district cases, the record actually showed that the procedure that was used was adopted because of inability to trace various forms of equipment around. Nothing in our record indicates that, but also nothing in our record indicates that the jury felt constrained to not look at it again. I mean, there's nothing in the record that I saw that could show why this wasn't sent back to the jury. I mean, there's like no redaction issues or anything like that on the video. Not that I could tell. Not that I could tell from looking at the video or from any discussion on the record. In any event, your position is there's nothing untold that happened because there's nothing in the record to indicate anything did take place that was improper. Exactly. The jury was influenced by an extremist. Exactly. But it was on the thumb drive, right? Yes. Well, it was by the time it came to us in the record. Right. I believe it continued to be, but it was originally taken on the telephone video. I think, I believe that it was transferred to the thumb drive before trial, but I actually don't know for sure. Well, let's assume it was on the thumb drive as it appears in the record now. I mean, you'd have to send a computer back then with the jury to look at this thumb drive. Correct. So then, theoretically, the jury would have access to a computer and the Internet and everything else. Yes. I'm just saying you'd have to admonish the jury on that. But doing it in open court would put that issue out. I think the point to this discussion in general is that one way or another, it's all within the court's purview. I think in the defense reply brief there was something about evidence being in control of the jurors. And my immediate response to that is, no, evidence is presented by parties in control of the court. And it's the court's discretion to determine how the evidence is presented and what evidence goes back or what should be, in fact, shown to the jury en masse in court. Have you found anything in the record during the jury trial conference wherein this video was discussed? No, I didn't. And it may simply be a memory lapse. I honestly don't recall seeing anything. Can you move, if you don't mind, to the instruction issue, please? Certainly. I understand the existing case law that both sides discussed in their briefs. I have to think, to me, that there's a problem in the logic in the case law, because the complaint is that the jurors are not instructed that the people had to disprove self-defense beyond a reasonable doubt. However, the issues instruction on the offense say that the offense had to have been committed without lawful justification. That's the definitional instruction, not the issues instruction. But, again, we're talking about when we tell the jurors that they get the fact. No, you have a definition instruction. The definition instruction is, ladies and gentlemen of the jury, this offense is this. And in order for the State to prove the case, the State has to prove first proposition, second proposition, third proposition. And among the propositions? And that's not one of the propositions on there, on this case. Okay. And perhaps I'm getting memory lapse here, because my recollection was that the jurors were instructed that the State had to prove each of the elements. And among those elements was that it was committed without lawful justification. No, I have it right here. IPI 11.16, which was People's 14, was given without objection, and that does not contain that. Whereas, IPI 11.15 was People's Instruction 13A, given without objection. And that talks, that's the definitional instruction that talks about knowingly and without legal justification. But if you want to take a look at it, the issues instruction is right here. It has three propositions, and none of them say anything about lack of justification. So assuming that that is correct and that element is not in the instructions, you then have the second part of it to deal with, though. She's alleging error under the purview of Berry, because the second part, it should have been given. And I'm going to let you tell me, you're not arguing, are you, that the second part should not have been given or didn't need to be given in this case? I think what I'm arguing is that if I assume that the second part was not given, there's a logical inconsistency where a jury is told that they must, that the people must prove all of the elements beyond a reasonable doubt. And among the elements that has to be proven beyond a reasonable doubt is that the defendant acted without justification. To me, the additional instruction then is surplusage, because whatever the context and whatever IPI number we've given them, they have been told that this is something, in order to convict, the State must have proven beyond a reasonable doubt. Well, how could it be surplusage, because in Berry, it was found to be reversible error, naturally. If it's surplusage, why would the Berry court conclude it was reversible error? I frequently don't understand why courts make certain decisions. And so I certainly acknowledge that between Berry and Huxted, they talk about the necessity of giving an instruction and determining when it is plain or harmless error or a non-reversible error. Let me make a suggestion that proceeds from the fact that it should have been given. The fact that it wasn't given, how do you respond to tell us that it was an error for a defendant not to give it? Assuming that it's error to not be given, it cannot be plain error because it did not affect the fairness of the jury trial, where the jury was at all times placed on notice, the State had to prove every element of the offense. And among the elements of the offense was that the defendant acted without justification. So it cannot possibly rise to the level of plain error. How about the sympathy? So you're arguing it's not clear and obvious error, correct? Yes. So we never get to the two pronouns is what you're saying? Yes. Okay. How about the prosecution's closing argument where they were trying to really get to the sympathy of the jurors talking about police officers and how they work for you, et cetera, et cetera? Yes. And I believe that we argued in our brief much of this was about context. Much of this was about this occurs at 2 in the morning and these guys who are doing their jobs come across a guy who they pull over speeding who is abusive to them. Again, this was unpreserved error, and assuming that they perhaps laid it on more thickly than they might have, it doesn't rise to plain error because he was, in fact, acquitted of speeding, which is what he pulled over for. You would agree it's error whether this arises to plain error or reversible error is one thing, but to say every single day these officers wake up, go to work, and protect and serve each and every one of us in the courtroom, that's improper, correct? I have a hard time saying something's improper, which in general is probably true, but I will acknowledge that they perhaps laid it on a little more thickly than was necessary. We all love our police officers, but, I mean, to tell a jury that, to try and bolster the officer's status in the eyes of the jury, I mean, the cases talk about that being improper, Threadgill being one of them is cited by counsel. And I think, again, I think part of this was counsel making a strategic decision to say that they were not against the police but that these police acted beyond the pale. Well, but, I mean, wasn't credibility a big issue in this case? I mean, you had basically a couple of witnesses, the police officer and the defendant. So weighing the credibility is really what it comes down to. So, I mean, I think, and I don't believe there was a jury instruction given in this case, which probably should have been given the same credibility of the police officer should be weighed the same as the credibility of any other witness. I do not recall seeing it. I don't recall seeing it either. But in light of the fact that it wasn't given, in light of the fact that there was a jury instruction that says just that, it's all the more reason the prosecution should know that you don't pump up a police officer and treat him differently than any other witness, and more particularly in a case where credibility is the issue. So if you think, if you're not sure if the prosecution shouldn't say something like this, if you're talking to prosecutors, I would probably tell them to stay away from this area. But... No, I totally understand what you're saying in that respect. And again, from my position, it's, I can't take the position that this particular unpreserved error or any of the unpreserved errors rise to the level of plain error. You've seen the video, right? Yes. Do you agree that the video does not really show the defendant striking Zeman in the shoulder? My view of the video was that it showed him pushing more than striking. Like grabbing or pushing and grabbing. Yeah. That would be, that would have been my view of it was that it showed... Again, I think everything goes very quickly in it. But my sense was that when whichever officer first put his arm in to go through the steering wheel, he pushed on it. And the arm went in first. I believe so. And then the push. I believe so. Because the arm went in to turn off the ignition. And I believe that's when the defendant pushed. Now, the defendant's testimony is when the arm went in, he was being choked. Again, that's an issue of credibility. Right. Right. And he was, anything he was doing was to try and get away from that choke. Right. That was his position. Okay. I'm sorry, did I get more questions? No. Thank you very much. All right. Thank you, Ms. Bates. Thanks, Mr. Brown. Ms. Eakin, you may proceed with your vote. I hope we have three concise points to make as to each issue. Again, in terms of watching the video in the courtroom, the fact that we don't have evidence that while the jurors were watching it in the courtroom, they weren't influenced by some type of improper communication or some type of over-influence, I really think that that's missing the point. And I think one of the things you have to consider here is the nature of the exhibit. I mean, the nature of the exhibit, as you were just discussing, the aggravated battery took place in terms of like 10 seconds. I watched the video many times, many more times than four times. You may have to watch the video in revealing the reasonable doubt issue many times. You may pause it. I paused it. It's really not that clear, is it? It's not that clear. So to play it in this format where the jury is requesting to see it again, I think it is safe to assume that they were asking so that they could do the same thing, that the jurors who were tasked with determining Mr. Magnuson's fate would have the same ability to control and view that video that I have, that you will have, that the state had. They weren't the triers of fact. They should have had that opportunity. And the fact that they didn't, that's what showed their deliberations. Well, how are we, again, assuming or inferring that they felt they had to see it more than once? Again, it's happening very fast, and it isn't really clear. But how do we fill in the gaps in the record? Do we presume they must have wanted to see it another time, and therefore it's error in reverse? I think under these circumstances, again, the way the other courts have looked at it. So, for instance, since it is a closely balanced case, if you look at Johnson, Johnson ultimately comes to the conclusion that the court didn't abuse its discretion because the defendant wasn't prejudiced because the contents of the video actually supported the state, not the defendant. So they came to the conclusion that the court did not abuse its discretion, and the essence of the court's decision wasn't there, it was just that we don't have the technological capability. But they ultimately decided the defendant was not prejudiced by this procedure because the contents would not have benefited him. Same thing in McKinley. And in Johnson, I must say, the defendant didn't testify. Same thing in McKinley. Defense doesn't present any evidence. And ultimately the court comes to the conclusion that this video would not have benefited him. So the manner of watching it in the courtroom did not prejudice the defendant. And even in McKinley, the majority, Justice Carter says, we're not saying, though, that in other circumstances, this type of procedure would not be prejudicial. We're just saying in this circumstance it's not prejudicial. And then in Lewis, which is the newest case, it was a 911 call. And the court found, you know, the court wouldn't look at plain error, but found that counsel wasn't ineffective because counsel could have had a strategic reason for not wanting a 911 call of the victim describing the domestic battery that had occurred. But would probably not want that played again. But in this case, I think it is very reasonable to assume with a 10-second video that captures the events in real time where there were, where you do have to see. I mean, at 228, you see an arm pushing Mr. Magnuson back. That took me several viewings to see that. So, you know, and that's a disputed issue, right? The disputed issue is did he grab the arm first or was he actually pushed back and did the choking start at that time? So here, I think that it is safe to say that based on this record, what the jury was looking for was to watch it in the privacy of the jury room where they could control the playback. And I think that it's very reasonable to assume that. I don't think that that's a speculation. And because of how the court responded to their request to do that and to bring them back out to the courtroom and then to just say that's it, I think the jury, it's also safe to assume, yeah, they would think it's futile. Why would we ask again? Apparently, when we asked to see this video again, this is the best we're going to get. And they were instructed that. And if you still need to see it another time, go ahead. We'll bring you back out again and you can see it again. So I think those are very reasonable assumptions to make based on the record in this case. As to the instruction, I want to point out, and I think this is very important, that the definition of aggravated battery was given first. And it says a person commits the offense of aggravated battery. If I can finish. Yeah, you can finish. Thank you. When he knowingly and without legal justification makes physical contact. The issue's instruction specifically omits the without legal justification language. Instead, it says the defendant knowingly. I have those here. I mean, I have the instruction and what was read to the jury. So you don't need to go over that. Okay. So I think it is important that by omitting the language where the jury is instructed as to what propositions the state has to prove beyond a reasonable doubt, without legal justification is actually omitted from that instruction. And, therefore, it is a plain and reversible offense. Thank you. The court will thank both attorneys for their arguments here today. This has been taken under advisory.